UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x
DANIEL LAURSEN

                Plaintiff,

    -against-

JO ANNE B. BARNHART,
Commissioner of Social Security,

                Defendant.
------------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. CV-05-0235(FB)

*Appearances:*
*For the Plaintiff:*
MICHAEL SWAALEY, Esq.
4459 Amboy Road, Suite 2
Staten Island, New York 10312

*For the Defendant:*
ROSLYNN R. MAUSKOPF, Esq.
United States Attorney
Eastern District of New York
By: KELLY HORAN, Esq.
Assistant United States Attorney
One Pierrepont Plaza
Brooklyn, New York 11201

**BLOCK, Senior District Judge:**

    Plaintiff Daniel Laursen ("Laursen") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits ("DIB") for the period August 31, 1996 through December 31, 1999. Both parties move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Because the ALJ's decision was based upon proper legal standards and is supported by substantial evidence, the Court grants the Commissioner's motion.

1

I.

According to the evidence in the administrative record ("A.R."), Laursen was employed as a police officer by the New York City Police Department ("NYPD") from October 1990 through August 1996; prior to 1990 Laursen was employed as a plumber and newspaper route manager. In November 1992, Laursen was involved in an automobile accident during which he sustained injuries to his neck, left shoulder, and back. Two years later, in September 1994, Laursen sustained an injury to his right knee. Laursen subsequently underwent reconstructive knee surgery; follow-up surgery to remove scar tissue was performed a year later. Although Laursen returned to police work following his 1994 injury, he was placed on restricted duty in April 1996, and in August 1996 was retired from the NYPD after the department's Medical Board granted his application for accidental disability retirement, finding that his knee injury prevented him from performing his full duties as a police officer.

In September 1996 Laursen filed an application for DIB with the Social Security Administration.[1] After Laursen's application was denied, Laursen requested a hearing before an ALJ. That hearing took place on October 27, 1997. In a decision rendered on December 6, 1997, the ALJ found that Laursen was not disabled within the meaning of the Social Security Act because he had not sustained his burden of showing his inability to perform his past work as a newspaper route manager, and on December 8, 1999, the

---

[1] Laursen's initial application stated that only that his "right knee is disabled"; however, Laursen subsequently submitted an additional disability report that described the injury to his left shoulder as an "additional illness or injury" and stated that he was "limited in walking, sitting and driving due to pain in knee and shoulder." A.R. at 77, 79. The Commissioner's decisions addressed both impairments.

2

Appeals Council denied Laursen's request for review, thereby rendering final the Commissioner's decision to deny benefits. Laursen subsequently sought review of the Commissioner's decision from the Court. By Stipulation and Order dated April 30, 2002, the Court remanded to the Commissioner for further proceedings, and on September 23, 2003, a supplemental hearing was held before the ALJ to determine whether Laursen was disabled during the period from August 31, 1996 to December 31, 1999.[2]

In addition to Laursen's testimony at the supplemental hearing, evidence considered by the ALJ on remand incorporated the medical evidence and testimony summarized in the vacated 1997 hearing decision "but not any rational[e] or conclusions contrary to this decision." A.R. at 202. The evidence supporting the decision upon rehearing included the medical records and opinions of Dr. Zelzefsky, Laursen's treating physician during the relevant time period; the medical records of Dr. Cuomo, who examined Laursen's shoulder and knee twice during 1995; the records of Dr. Hainline, a neurologist whom Laursen consulted in 1994 regarding neck and shoulder pain and numbness; the medical records of Dr. Bonamo, an orthopedist who performed both surgeries on Laursen's knee and treated him following the operations; medical records of Dr. Sherman, a second orthopedist who examined Laursen in connection with his application for disability retirement benefits; a letter from Ira Reiter of Staten Island Physical Therapy Associates; the evaluation of Dr. Nepomuceno, the government's

---

[2] In the time between the Commissioner's denial of his application for benefits and the Court's remand, Laursen filed a second application for disability benefits, resulting in a decision finding Laursen disabled as of January 1, 2000. The focus of the supplemental hearing upon remand in 2003, and now of the present action, was limited to adjudicating Laursen's entitlement to benefits for the period between August 1996, when his first application for DIB was submitted, and the end of 1999.

consultative examiner who rendered an orthopedic evaluation of Laursen; and a residual functional capacity ("RFC") assessment prepared by the government's medical consultant.

## A. Medical History and Opinions

### 1. Opinion of Laursen's Treating Physician

Dr. Zelefsky, who is certified in physical medicine and rehabilitation, treated Laursen from 1996 to 2000; during this period, Laursen visited Dr. Zelefsky approximately four times per year. Results from a December 1996 nerve conduction test ordered by Dr. Zelefsky indicated the presence of left cervical radiculopathy and left ulnar neuropathy at the elbow, and in October 1997, Dr. Zelefsky diagnosed Laursen with cervical radiculopathy, left rotator cuff tendinitis, left shoulder impingement syndrome, and right knee derangement and arthritis. Dr. Zelefsky's records indicate that Laursen's "chief complaints" were of pain in his left shoulder that was exacerbated by lifting his arm, and persistent stiffness and soreness in his cervical spine; Dr. Zelefsky also noted that Laursen had muscle tenderness in his cervical spine and left rotator cuff but a normal range of motion in his shoulder, and detected mild joint tenderness but no joint warmth or swelling in Laursen's lower extremities. Dr. Zelefsky described treatment consisting of rehabilitation therapy, stretching and strengthening exercises, and opined that Zelefsky was "totally disabled and unable to engage in any type of gainful employment"; a September 11, 2003 letter submitted in connection with the supplemental hearing included an additional diagnosis of disc herniation and stated that Laursen was totally disabled as of his first visit in 1996. A.R. 238. In 1998 Laursen's attorney forwarded a completed RFC assessment to Dr. Zelefsky, requesting Zelefsky's signature on the assessment "if all of the items checked are true." A.R. at 236. Dr. Zelefsky signed the assessment, which stated,

4

without explanation, that Laursen could carry a maximum of five pounds; stand or walk less than two hours per day, sit less than six hours per day, and provided that Laursen's capacity to push and pull was "limited." A.R. at 235.

## 2. Opinions of Examining and Consulting Physicians

The remaining medical records and opinions in the administrative record repeat Laursen's complaints of pain in his neck, shoulder, back, and knee; with the exception of Dr. Cuomo, their assessments regarding the extent of Laursen's impairment and functional limitations are significantly less severe. Dr. Hainline, who examined Laursen in 1994, prior to his knee injury, noted Laursen's complaints of intermittent pain and short-lived numbness in his left arm and legs after sitting on hard surfaces for "prolonged" periods of time, and diagnosed Laursen with cervical strain and mild left shoulder impingement. A.R. at 108. Although Dr. Hainline did not comment on Laursen's functional capacity, he found a normal range of motion in Laursen's trunk and neck, and normal sensation, coordination, gait and station. Dr. Hainline's records also state that MRIs of the cervical and lumbar spine were performed in November 1992 and January 1993, and that both reflected normal results; however, the administrative record also contains a 1999 MRI that revealed no disc herniation but indicated a left anterior indentation of the thecal sac. Reflecting two examinations of Laursen during 1995, after Laursen sustained his knee injury, Dr. Cuomo's records contained a diagnosis of left shoulder instability and tendonitis in the knee, and concluded, without further explanation, that Laursen was "fully disabled." A.R. at 190.

In 1996, following Laursen's knee surgery, Dr. Bonamo noted that Laursen "still experiences some difficulty with pain, swelling, and giving way"; however, in

contrast to Dr. Cuomo's assessment of complete disability, Dr. Bonamo opined that Laursen had been instructed to perform "full activity to tolerance," and described his only limitations as potential difficulty in "performing such acts as heavy lifting, squatting, running, or jumping." A.R. at 176-77. Dr. Sherman also noted that Laursen experienced knee pain, following "prolonged" sitting and use of stairs, and that he took several advils per day to treat his pain, but concluded that he was capable of performing light duty. A.R. at 284. A March 1996 letter from Ira Reiter, a physical therapist who had treated Laursen for the previous 1 ½ years, opined that Laursen had made progress in rehabilitation following his knee surgery, although he noted that Laursen had a "moderately antalgic" gait, complained of "intermittent" pain in his right knee, especially following "prolonged weight bearing," and had difficulty using stairs. A.R. at 227.

Dr. Nepomuceno, the state medical consultant to whom Laursen was referred for orthopedic evaluation in November 1996, reported that Laursen was able to regularly climb stairs to reach his second floor apartment and drive for up to an hour at a time, had no trouble sitting down and could stay seated for up to an hour. Upon examination, Dr. Nepomuceno found that the range of motion in Laursen's upper and lower extremities and back was within normal limits, and found no muscle atrophy, swelling of the knee or tenderness in the knee or back area. Dr. Nepomuceno opined that Laursen was partially disabled because he lacked full use of his right knee joint, and concluded that he was limited in his ability "to do any heavy lifting and bending of the knee [or] . . . stand[] for any length of time." A.R. at 180. In November 1996, an RFC assessment completed by Dr. Reynolds, the government's medical consultant, concluded that Laursen retained the capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, could stand or

walk with normal breaks for six hours in a day, and sit with normal breaks for six hours in a day; no pushing, pulling, or postural limitations were noted. Dr. Cordice, a second medical consultant, concurred with this assessment in December 1996.

### 3. Laursen's Testimony

Laursen testified during his 1997 hearing that he had pain in his neck, left shoulder, and right knee, which he managed by taking Advil on a daily basis. Laursen stated that he could walk two blocks before feeling pain in his knee, and that he would begin feeling pain after standing for 20 minutes. Laursen further stated that his knee became stiff after being seated for half an hour, and that if he remained seated for over an hour he would have difficulty walking afterwards. Contrary to the RFC signed by Dr. Zelefsky, however, Laursen estimated that he could comfortably lift about ten pounds. Laursen also testified that he drove to school twice a week and to church twice a month. At the supplemental hearing in 2003, Laursen again testified that during the relevant time period he suffered from right knee, neck, and shoulder pain, which precluded him from performing his past work.

## B. ALJ's Determination

The ALJ rendered his decision on March 22, 2004, applying the five-step procedure for evaluating disability claims as required by the relevant regulations. *See* 20 C.F.R. §§ 404.1520, 416.920. As the Supreme Court has explained:

> At the first step, the agency will find non-disability unless the claimant shows that he is not working at a 'substantial gainful activity.' At step two, the SSA will find non-disability unless the claimant shows that he has a 'severe impairment,' defined as 'any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities.' At step three, the agency

determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called 'vocational factors' (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (internal quotations and citations omitted). While "[t]he burden is on the claimant to prove that he is disabled within the meaning of the [Social Security] Act[,] . . . if the claimant shows that his impairment renders him unable to perform his past work, the burden then shifts to the [Commissioner] to show that there is other gainful work in the national economy [that] the claimant could perform." *Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000) (citations and quotation marks omitted).

The ALJ found with respect to the first three steps that Laursen was not engaged in substantial gainful work and suffered from musculoskeletal impairment that, while severe, did not meet or equal any of the impairments listed in Appendix 1 of the regulations. At step four, the ALJ considered the combined impact of Laursen's impairments and determined based upon all of the evidence in the record that Laursen retained only the residual functional capacity to perform sedentary work and was therefore unable to perform any of his past relevant work. In making this determination, the ALJ considered "all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with objective medical evidence and other evidence."

8

The ALJ also considered all medical opinions in the record, but determined after evaluating "in person contact, quantity and quality of the treating relationship, duration, supportability, internal and external consistency, area of practice and known qualifications," that none of the opinions were "so complete and uncontradicted as to be entitled to controlling evidentiary weight." A.R. at 205. In particular, the ALJ declined to give significant weight to Dr. Zelefsky's opinion regarding Laursen's functional capacity, noting this assessment was prepared by Laursen's attorney and did not provide any supporting explanation for the conclusions it contained; the ALJ also found that Dr. Zelefsky's statement that Laursen was totally disabled was inconsistent with Dr. Zelefsky's medical findings and was a conclusion on an issue reserved to the Commissioner.

At step five, the ALJ acknowledged that because Laursen had demonstrated his inability to perform his past relevant work, the burden shifted to the Commissioner to show that there were other jobs existing in the economy that the claimant could have performed. Because the relevant guidelines indicated that based upon his "then young age, superior education, skilled and semi-skilled but not transferable past relevant work experience, and residual functional capacity for a full range of sedentary work activity" between 1996 and 1999, there was suitable work existing in the economy which Laursen could have performed, and Laursen accordingly was not disabled during this period.

The Appeals Council denied Laursen's request for review on November 17, 2004, thereby rendering final the Commissioner's decision to deny benefits.

## II.

### A. Standard of Review

The Court, in reviewing the Commissioner's decision, must evaluate whether

9

it is "'supported by substantial evidence in the record as a whole or . . . based on an erroneous legal standard.'" *Curry*, 209 F.3d at 122 (quoting *Schaal v. Apfel*, 134 F.3d 496, 500-01 (2d Cir. 1998). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Laursen argues that the ALJ improperly concluded that his chronic knee problems and the indentation of his thecal sac did not meet or equal a listed impairment, and that the ALJ's decision that Laursen was not disabled was not supported by substantial evidence because the ALJ did not (1) properly evaluate Laursen's subjective pain complaints or (2) or give controlling weight to the opinion of Laursen's treating physician.

## B. Determination Regarding Listed Impairments

The ALJ correctly concluded that Laursen did not sustain his burden of showing that his impairment met or equaled one of the impairments listed in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A § 1.01 provides that a major joint dysfunction qualifies as a listed impairment if it "result[s] in inability to ambulate effectively." An inability to ambulate effectively is in turn defined as "an extreme limitation of the ability to walk . . . defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand held assistive device(s) that limits the functioning of both upper extremities." *Id.* at § 1.00 B(2)(b)(1). Examples of ineffective ambulation are "the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb

a few steps at a reasonable pace with the use of a single hand rail." *Id.* at § 1.00 B(2)(b)(2). Although the medical evidence presented by Laursen demonstrates that he suffered from a knee joint dysfunction during the relevant time period, it does not establish that his movement was sufficiently compromised that it resulted in an inability to ambulate as defined by the regulations. Absent such evidence, the ALJ properly concluded that Laursen's knee injury did not constitute a listed impairment.

With respect to the indentation on Laursen's thecal sac reflected in Laursen's 1999 MRI, the regulations provide that a disorder of the spine qualifies as a listed impairment only if it "result[s] in compromise of a nerve root," as evidenced by "neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." *Id.* at § 1.04(A). The record does not contain a diagnosis of nerve root compression, and examinations revealed that Laursen retained a normal range of motion with no muscle atrophy, motor, sensory, or reflex loss. The ALJ therefore did not err in refusing to find that the injury Laursen sustained to his back did not meet or equal a listed impairment.

## C. ALJ's Credibility Determination

Although Laursen argues that the ALJ did not properly evaluate the credibility of his subjective complaints of pain in determining that he retained the residual functional capacity for sedentary work, this argument is without merit. In cases where, as here, the "medical signs or laboratory findings show that [the claimant] ha[s] a medically determinable impairment(s) that could reasonably be expected to produce [the claimant's]

symptoms, [the ALJ] must then evaluate the intensity and persistence of [the] symptoms so that [she] can determine how [the claimant's] symptoms limit [the] capacity for work." 20 C.F.R. § 404.1529(c)(1). In considering the effect that a claimant's symptoms have on that individual's ability to work, the ALJ must consider the objective medical evidence, such as "evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption," as well as evidence regarding the claimant's daily activities, the medications or treatments used to alleviate the claimant's symptoms, and the effectiveness of such treatments. 20 C.F.R. § 404.1529(c)(2)-(3). "As a fact finder, the ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence." *Peitrunti v. Director, Office of Workers' Compensation*, 119 F.3d 1035, 1042 (2d Cir. 1997) (citing *McLaughlin v. Secretary of Health, Education and Welfare*, 612 F.2d 701, 705 (2d Cir. 1980)). *See also Carroll v. Sec'y of Health and Human Services*, 705 F.2d 638, 642 (2d Cir. 1982) ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."). "If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Aponte v. Secretary, Dept. of Health and Human Services*, 728 F.2d 588 (2d Cir. 1984) (citing *McLaughlin*, 612 F.2d at 704).

In concluding that Laursen's statements regarding the limitations caused by his symptoms were "not totally credible or supported by adequate medical evidence," the ALJ properly assessed the effect of Laursen's asserted limitations on his ability to work in light of the factors set forth in 20 C.F.R. § 404.1529(c)(2)-(3), and there is substantial evidence as a whole to support the ALJ's findings. The opinions of doctors Bonamo and

Nepumocemo limited Laursen's impairments to an inability to perform strenuous acts as heavy lifting, squatting, running, or jumping, and Dr. Sherman concluded that Laursen had the ability to perform light police work; other physicians reported that Laursen complained of pain only after prolonged weight bearing, sitting on hard surfaces, or use of stairs. The government's medical consultant also determined that Laursen retained the functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, and sit, stand or walk for six hours in a day, with no pushing, pulling, or postural limitations. As required by the relevant regulations, the ALJ also considered the conservative treatment recommended by Laursen's physicians, including Dr. Zelefsky; the fact that Laursen's pain medication during the relevant period was limited to daily doses of non-prescription Advil; and Laursen's daily activities, including that he drove a car regularly and was able to do so for periods of up to an hour, regularly used the stairs to reach his second floor apartment, and was able to assist in taking care of his father. In light of the evidence as a whole, the ALJ's decision to discount Laursen's testimony regarding the extent of his pain and attendant limitations must be upheld.

## D. The Treating Physician Rule

In determining whether the ALJ's decision is supported by substantial evidence, the Court must assess whether the ALJ properly applied the treating physician rule. The ALJ is required to give controlling weight to the opinion of a claimant's treating physician, provided that the "treating source's opinion on the issue of the nature and severity of [the] impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case records." *Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) (quoting 20 C.F.R. §

13

404.1527(d)(2). However, the regulations and policy rulings make clear that the Commissioner will not "give any special significance to the source of an opinion on issues reserved to the Commissioner," which include a claimant's RFC. 20 C.F.R. § 404.1527(e)(2)-(3). Rather, a treating physician's statement "about what an individual can still do [despite his impairment] is medical opinion evidence that an adjudicator must consider together with all of the other relevant evidence (including other [statements about what that individual can do] that may be in the case record) when assessing an individual's RFC." *Id.* at *5. Furthermore, because opinions regarding whether an individual is "disabled" or unable to do particular types of work "are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner. Such opinions on these issues must not be disregarded. However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance." *Id.*

The ALJ did not reject the findings of Dr. Zelefsky regarding the nature of Laursen's impairments, which, as discussed, were not inconsistent with the opinions of other physicians who examined Laursen. However, the ALJ did not find Dr. Zelefsky's opinion regarding Laursen's functional capacity or the extent of his disability to be persuasive because he concluded that Dr. Zelefsky's opinion regarding the extent of Laursen's limitations was not independently offered, was not consistent with Dr. Zelefsky's objective medical findings and other medical evidence in the record, and was not supported by any explanation as to why Laursen's injuries would completely impair his ability to work. Because the ALJ was not required or permitted to give controlling weight to Dr. Zelefsky's opinion regarding the extent of Laursen's disability, and because the ALJ evaluated the treating physician's opinion regarding Laursen's limitations and gave

14

appropriate explanations for discounting this opinion, the ALJ's application of the treating physician rule was proper, and his determination that Laursen retained a functional capacity for sedentary work was otherwise supported by substantial evidence, including the opinions of Doctors Bonamo and Nepomucemo and the functional evaluation of the government's medical consultant.

## III.

Because the Commissioner's determination was not based on an erroneous legal standard and is supported by substantial evidence, the Court grants defendant's motion for judgment on the pleadings; accordingly, plaintiff's motion is denied.

**SO ORDERED.**

_____FB_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
February 27, 2006